**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHARLES A. NEWELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 11 C 1907** |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Charles A. Newell ("Newell" or "claimant"), has brought a motion for summary judgment [26] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). The Commissioner filed a cross-motion for summary judgment asking that we uphold the decision of the Administrative Law Judge ("ALJ") [34]. We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion is granted and the Commissioner's motion is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.

**I.      BACKGROUND**

**A.      Procedural History**

Newell filed his application for disability insurance benefits on December 7, 2007 alleging disability beginning January 1, 2003 due to injuries he sustained to his right leg

in a motor vehicle accident. (R. 76.) His date last insured was March 31, 2004. (*Id.*)

Newell's application was denied initially on April 11, 2008 and again on reconsideration

on July 9, 2008. (R. 78-82, 89-92.) Newell then requested a hearing, which was held

on July 27, 2009 before ALJ Jose Anglada. (R. 25-73.) At the hearing, both Newell and

Vocational Expert ("VE") Thomas Grzesik testified. (*Id.*) On September 15, 2009, ALJ

Anglada issued his written decision denying claimant's application for benefits. (R. 10-

21.) The Appeals Council denied Newell's request for review on February 24, 2011,

making ALJ Anglada's decision the Commissioner's final decision. (R. 1-3); *Estok v.

Apfel*, 152 F.3d 636, 637 (7th Cir. 1998). Claimant subsequently filed this action in the

district court on March 18, 2011.

### B.    Medical Evidence

#### 1.    Treating Physicians

On July 8, 2003, Newell reported to the emergency room ("ER") of Morris

Hospital in Morris, Illinois after he was involved in a motor vehicle accident. (R. 339.)

As he explained to the ER staff, Newell was struck sideways by a moving vehicle while

he was sitting at rest on his motorcycle. (*Id.*) He arrived at the ER five hours later

complaining of abrasions to his right leg. (*Id.*) An x-ray of Newell's right knee and leg

showed that he had not sustained a fracture, though some deformity of the proximal

metaphysis of the tibia suggested an old fracture that had healed. (R. 345.) The x-ray

also indicated early degenerative changes to the medial knee compartment and an

early spur formation to the medial tibia. (*Id.*) ER physician Dr. Marc Crockett examined

Newell and found that he had a normal gait, normal range of motion in the neck, and a

normal back with no tenderness. (R. 340.) Newell's right leg showed two large

hematomas on the lower front, but he retained good motor and sensory functioning in his limbs.  (*Id.*)  Dr. Crockett diagnosed Newell with an acute right leg contusion resulting from a motor vehicle accident and recommended that he keep the leg elevated for one to two days.  (*Id.*)  Newell was released after being advised to take over-the-counter pain medication and to follow up with his family doctor in two to three days. (*Id.*)

Newell followed these instructions by consulting his regular physician, Dr. Charles Comfort, on July 10, 2003.  (R. 319.)  Dr. Comfort noted that his right leg was red and swollen, and he recommended that Newell take the prescription pain drug Vicodin to relieve his discomfort.  (*Id.*)  One week later on July 17, 2003, Newell visited Dr. Comfort once again.  (R. 320.)  This time, Newell's leg had improved from red to yellow, and Dr. Comfort noted that he was feeling better overall.  (*Id.*)  On August 5, 2003, Newell complained to his physician that his right knee felt as if it were going to swell and that he had a burning sensation in the right leg.  (*Id.*)  Dr. Comfort referred Newell to an orthopedist, Dr. Meyer, but Newell did not follow up on this recommendation.  (R. 320-21.)  Instead, he returned to see Dr. Comfort several weeks later on September 11, 2003.  (R. 321.)  His physician noted that Newell was still walking with pain, but significant improvements were seen; the wounds had "healed," the leg looked "great," and a full range of motion was observed.  (*Id.*)  Overall, Dr. Comfort found that Newell was "90% better."  (*Id.*)

Unfortunately, as the wounds caused by his vehicular accident were healing, Newell was also suffering from feelings of depression.  On December 4, 2003, he consulted with psychiatrist Dr. Mary Cherian complaining that he was "fighting being

depressed all the time." (R. 207.) Newell reported that he was anxious, angry, and irritable, and that he had broken two teeth by force of the muscle tension in his jaw. (*Id.*) Dr. Cherian noted that Newell felt "overwhelmed" with his home life and experienced significant tensions with his wife, who was also Dr. Cherian's patient. (*Id.*) Newell stated that he had difficulty sleeping and was taking Tamezepam to help him sleep about five hours each night.[1] (*Id.*) He was no longer "enjoying his life" because he could not do his normal activities when he was always worrying about his wife. (*Id.*) Newell was able to concentrate. (*Id.*) He had recently lost thirty pounds. (*Id.*) As Dr. Cherian indicated, Newell was a Vietnam veteran who suffered from disturbing memories, though he did not have flashbacks. (R. 208.) He had some suicidal ideation with a depressed mood and a "sad, tearful" affect. (R. 208, 210.) Dr. Cherian diagnosed Newell as having a major depressive disorder with a seasonal component, anxiety, and post-traumatic stress syndrome ("PTSD"). (R. 210.) The psychiatrist indicated that Newell was not able to afford psychotherapy, and she began his treatment by prescribing 25 mg of Zoloft for one week, and 50 mg thereafter. (*Id.*)

Newell returned to see Dr. Cherian on January 8, 2004. (R. 206.) Although he was "not back to normal," Dr. Cherian determined that he was a "little better" after several weeks of treatment on medication. (*Id.*) He was less nervous and depressed, though he was still experiencing a sense of "impending doom." (*Id.*) Dr. Cherian decreased the dosage of Ambien and doubled the level of Zoloft to 100 mg per day.

---

[1] Dr. Cherian's notes provide the first clear indication of the medications Newell was taking at the time. These include: Tamezepam, Micardis, Synthroid, Pravochol, and Tramterene. (R. 209.) After examining Newell, Dr. Cherian substituted Ambien for Tamezepam to help him sleep. (R. 210.)

(*Id.*)  By February 9, 2004, Newell's condition had again improved.  (R. 205.)  He was calmer and less overwhelmed, and Dr. Cherian noted that he no longer felt suicidal. (*Id.*)  He was still anxious and sad, however, and she increased the level of Zoloft once again to 150 mg per day.  (*Id.*)  Newell consulted Dr. Cherian a final time on March 22, 2004.  (R. 204.)  His mood and affect were better than before, with less irritability.  (*Id.*) Although he still experienced problems with worry, Dr. Cherian determined that his nervousness had improved to a level of four or five out of ten.  (*Id.*)  She increased the prescription of Zoloft to 200 mg a day and recommended that Newell return in eight weeks.[2]  (*Id.*)

The record is unclear on what course of treatment, if any, Newell pursued for his depression and PTSD after he stopped seeing Dr. Cherian.  On October 11, 2006, however, Newell visited the Veterans Administration ("VA") hospital in Hines, Illinois, where he was noted as suffering from PTSD.[3]  (R. 218.)  On March 8, 2007, Newell met with Dr. Aparna Sharma to assess his condition.  (R. 242-47.)  Dr. Sharma noted that Newell complained of hopelessness, worthlessness, and hypervigilance.  (R. 243.) These issues were particularly pressing during the winter months.  (*Id.*)  Newell also told Dr. Sharma that he had flashbacks to experiences in Vietnam two to three times a week, and that he experienced intrusive thoughts about the war on a daily basis.  (*Id.*)

---

[2]  Based on a March 25, 2004 phone consultation, Dr. Cherian reduced the level of Zoloft to 100 mg because claimant was experiencing headaches.  (R. 203.)  The record is not entirely clear as to why Newell did not return to see Dr. Cherian after the March 22, 2004 appointment.  He testified at the hearing that he did so because his mental health care coverage had expired.  (R. 48.)  However, Newell reported to Dr. Aparna Sharma on March 8, 2007 that he stopped seeing Dr. Cherian because "the meds were not helping."  (R. 242-43.)

[3]  Although this visit post-dates Newell's date last  insured of March 31, 2004, he contends  that the VA records concerning his mental health treatment are relevant to the ALJ's decision.

Problems with anxiety continued to surface, especially in the evening, and Newell awoke to go to the bathroom every one to two hours during the night. (*Id.*) Newell also reported that he had been in a PTSD support group, but he stopped going because one member "talks too much." (R. 244.) Dr. Sharma diagnosed Newell as suffering from depression, PTSD, and seasonal affective disorder ("SAD"). (R. 246.) He began Newell on 10 mg per day of the antidepressant medication Celexa and 100 mg of Trazodone to help him sleep. (R. 247.) Dr. Sharma also recommended that Newell participate in individual and group therapy for PTSD, but Newell declined both options. (*Id.*)

Newell's mood improved by his second visit with Dr. Sharma on April 20, 2007. (R. 234-36.) The psychiatrist stated that claimant's depression had improved from a level of seven to four out of ten, and his interest level, motivation, and ambition had also increased. (R. 234.) Feelings of hopelessness and helplessness had disappeared as well. (*Id.*) Although Newell continued to struggle with anxiety and "crazy dreams," he was no longer experiencing flashbacks. (*Id.*) Dr. Sharma increased the dosage of Celexa to 20 mg and again recommended that Newell attend group and individual therapy. (R. 235.) The record does not suggest that Newell followed up his treatment with Dr. Sharma after the April 20, 2007 visit. But, at the hearing, Newell testified that Dr. Comfort prescribed Lexapro and Amprizile to help control his anxiety.[4] (R. 49, 329.)

---

[4] We note that much of the medical record concerns Newell's struggle with skin cancer, bladder tumors, and bladder cancer. The records related to these disorders all post-date claimant's date last insured of March 31, 2004. The bladder problems, for example, began when Newell sought treatment at the Morris Hospital on December 13, 2004 after discovering blood in his urine. (R. 353.) We do not review the evidence related to claimant's bladder and skin conditions because Newell, the Commissioner, and the ALJ have all omitted any discussion of these issues. Newell concedes that bladder cancer is "immaterial" to his disability claim. (Pl.'s Mot. at 6.) The ALJ correctly notes that Newell listed his skin and bladder problems as reasons

## 2. State Agency Consulting Physicians

On March 30, 2008, Dr. Leslie Fyans completed a "Psychiatric Review Technique" evaluation for Newell.  (R. 529-41.)  Although Newell had been treated for depression by Dr. Cherian as early as December 4, 2003, Dr. Fyans appears not to have been aware of this treatment.  Instead, she noted that the record did not suggest that Newell had undergone treatment for depression prior to his late date insured of March 31, 2004.  (R. 541.)  Dr. Fyans determined that "insufficient evidence" was available to make any determination concerning Newell's psychiatric condition, and she made no findings concerning his depression, PTSD, or any functional limitations.  (R. 529-41.)

State agency consulting physician Dr. Sandra Bilinsky also completed two "Illinois Request for Medical Advice" forms concerning Newell.  (R. 543-48.)  In the first, dated April 3, 2008, Dr. Bilinsky found that Newell did not meet or equal a Listing for bladder cancer, and that he should be limited to light work due to his ileal conduit.  (R. 544.)  In the second form, issued five days later on April 8, 2008, Dr. Bilinsky considered Newell's claims related to the leg injury he sustained in the July 8, 2003 vehicular accident.  (R. 546-48.)  Dr. Bilinsky noted that Newell experienced contusions to his leg, but she found that his injuries were not severe.  (R. 548.)  Dr. Francis Vincent and Dr. Kirk Boyenga completed a follow-up report for the SSA on July 3, 2008.  (R. 549-51.)  These physicians affirmed both Dr. Fyans' and Dr. Bilinsky's earlier reports, noting that Newell's depression had improved as of March 22, 2004.  (*Id.*)

---

why he could not work.  (R. 17, 141.)  But Newell's attorney argued to the ALJ that the relevant issues at the disability hearing only included his mental condition, leg injuries, and headaches.  (R. 627-28.)  Like the ALJ and the parties, we limit our discussion to these issues.

### C.    Supporting Letters

On July 22, 2009, Newell's friend Richard Krohn wrote a letter to the ALJ describing the effects of Newell's 2003 vehicular accident.  (R. 189.)  Krohn states that Newell never fully recovered from his injuries and continues to have pain in his back, left hip, right leg, and right ankle.  (*Id.*)  According to Krohn, the distance Newell can walk is limited, and he no longer uses a walking trail next to his property or engages in former activities like hiking, fishing, or riding his all-terrain vehicle.  (*Id.*)  Krohn explains that there have been "countless times" when he has been required to help out with chores that Newell can no longer carry out, such as moving furniture, cutting grass, and stacking wood.  (*Id.*)

Newell's daughter, Christy Newell, also provided the ALJ with a written statement on July 25, 2009.  (R. 191.)  She states that Newell has only been able to walk a quarter of a mile at a time since the accident, and he must walk slowly.  (*Id.*)  His ability to stand or walk is limited to thirty minutes at a time, after which he must rest for at least another thirty minutes.  (*Id.*)  Ms. Newell claims that her father's pain and weakness have caused him to be depressed and have changed his formerly outgoing personality.  (*Id.*)

### D.    Claimant's Testimony

At the July 27, 2009 hearing before ALJ Anglada, Newell testified as follows. Newell was born on October 11, 1948, making him 60 years old at the time of the hearing.  (R. 29.)  He is married, and lives with his wife, daughter, and three grandchildren in Morris, Illinois.  (R. 30.)  His wife is disabled from injuries she sustained in a car accident "maybe" three years prior to the hearing and receives social security benefits.  (R. 31.)   As for education, Newell graduated from high school.  (R. 29.)

8

Prior to his retirement on September 1, 1998, Newell worked as a machinist for Caterpillar.  (R. 32, 34-35.)  His work history sheet shows that he had been employed continuously at Caterpillar since 1968.  (R. 625.)  He took early retirement in order not to lose his retirement bonus; he also found his work at the Caterpillar plant to be very stressful.  (R. 33, 58.)  At the time of the hearing, Newell was receiving approximately $1,900 each month from his work pension, and he retained his employer-provided health insurance.  (R. 33-34.)  Newell had hoped to obtain another job after retiring from Caterpillar.  (R. 58.)  In particular, he had hoped to obtain a certified drivers license that would permit him to drive semi-trailers.  (*Id.*)  Newell did not state what prevented him from doing so.

In July 2003, Newell was hit by a van while he was trying to cross an intersection on his motorcycle.  (R. 35-36.)  The van "center punched" him by hitting the motorcycle "perpendicular."  (R. 35.)  Newell went to the hospital for x-rays of his leg and was advised to keep the legs in the air to prevent blood clots from forming.  (R. 39.)  He followed up with his family doctor two days later, but he suffered no fractures or broken bones.  (R. 39-40.)  His physician did not prescribe a course of physical therapy or other treatment for his injuries.  (R. 38.)  Instead, Newell just "tried to walk it off," though he claimed that he was unable to walk at all for one month after the accident.  (R. 37-38.)  To help himself walk with the pain he experienced after the accident, Newell began using a cane.  (R. 37.)  Newell stated that he was no better off at the time of the hearing than he was one year after the accident, and that he had to "live with the pain every day."  (R. 36.)  Specifically, he testified he suffers from pain in his ankles, right knee, left hip, and left shoulder.  (*Id.*)  He also stated that he has spasms in his back muscles.

9

(*Id.*)  Newell takes over-the-counter medications such as Advil and Excedrin to relieve his pain, though he avoids prescription pain medication as much as possible.  (R. 37.)

In addition to his accident-related injuries, Newell has also been treated for headaches "for years."  (R. 42.)  The headaches began before he retired, but they became worse after he stopped working for Caterpillar.  (*Id.*)  At the time of the hearing, they were not as frequent as they had been, though Newell continued to seek treatment for them.  (R. 42-43.)  He takes Advil to relieve his headaches, but doing so sometimes brings on another headache the following day.  (R. 66.)

Newell stated that he had also been treated for PTSD that resulted from his experiences in Vietnam.  (R. 43.)  Newell served in the Navy from 1968 to 1972, following which he was on inactive duty for two additional years.  (R. 43, 46.)  As a sailor, Newell was stationed primarily on a ship, though he was briefly transferred to an airstation at Da Nang.  (R. 44-45.)  He was not involved in combat directly, but he saw a plane crash and knew men who died in the war.  (R. 44-45, 59-61.)  According to Newell, he cannot detach himself from the fact that the people he knew during his war years were dying and that he could not act to help them.  (R. 47.)  Although the PTSD did not prevent him from working prior to his retirement, Newell applied for benefits from the VA after retirement but was turned down.  (R. 47-48.)  Newell testified that he began treatment with Dr. Cherian, who placed him on Zoloft, and his current family doctor prescribes two medications for anxiety.  (R. 48-49, 61.)  He discontinued treatment with Dr. Cherian when his mental health benefits expired, and he later discontinued group therapy treatment at the VA because he "couldn't stand it."  (R. 47-48.)

Newell described a typical day as involving taking care of his wife and watching

10

TV. (R. 50.) He helps with some of the household chores such as vacuuming and cooking, and he goes grocery shopping by using his grocery cart as a walker for support. (R. 50-51.) Grocery shopping tires Newell, however, and he must sit down for thirty to sixty minutes when he returns home. (R. 51.) He had been able to ride a ten-speed bicycle up to five miles before developing bladder cancer, but he can no longer do so after undergoing surgery for the cancer. (R. 54-56.) Newell's only hobby is playing the banjo. (R. 52.) Although he usually plays for himself, he did perform for a group of people three years before the hearing while on a fishing trip. (R. 53, 57.)

### E. Vocational Expert's Testimony

Vocational Expert Thomas Grzesik also briefly testified at the July 27, 2009 hearing. (R. 69-73.) Grzesik described Newell's past work as a machinist as being skilled work that Newell had performed at the medium exertional level. (R. 70.) The ALJ then posed several questions to the VE. He first asked the VE to assume a person with Newell's past relevant work who was also an individual of advanced age with a twelfth-grade education. (R. 71.) Given those conditions, the ALJ inquired: "if the claimant were limited to medium work and had a moderate inability to remember, understand, and carry out detailed instructions, and that would be level five on a scale of one to 10 where 10 is the greatest degree of severity. How would that affect the ability to do the work that he did in the past?" (*Id.*) The ALJ answered that such a person would not be able to perform Newell's past work. (*Id.*) The ALJ then asked the VE if such an individual could perform any other work. (*Id.*) The VE responded that the person could undertake a number of other jobs at the medium, unskilled level. (*Id.*) These include work as a hand packager, a store laborer, and an industrial cleaner. (*Id.*)

11

The VE noted that 7,000 jobs in the first category exist in the area of northern Illinois and northwest Indiana; 8,000 regional jobs are available in the second category; and 14,000 positions as an industrial cleaner exist. (R. 71-72.)

Lastly, the ALJ asked the VE whether, given an exertional limitation of light work, the hypothetical person's acquired job skills could be transferred to other work. (R. 72.) The ALJ answered that the person's work skills could be transferred to light work as a grinder set-up operator. (*Id.*) However, the VE also testified that, if the hypothetical person were restricted to a moderate ability to understand, remember, and carry out detailed instructions, no transferable job skills would exist. (*Id.*)

## II. ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). A court must "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Steele*, 290 F.3d at 940)).

While the ALJ need not discuss every piece of evidence in the record, he "must build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision," *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009), but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). In so doing, the ALJ must "sufficiently articulate his assessment of the evidence to 'assure us that [he] considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B.    Analysis under the Social Security Act

To qualify for disability benefits, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is deemed to be disabled if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which . . . lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry:  "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy."

13

*Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). At step five, the burden shifts to the Commissioner to show that the "claimant is capable of performing work in the national economy." *Id.* at 886.

ALJ Anglada applied this five-step analysis in reaching his decision to deny Newell's request for benefits. (R. 13-21.) At step one, the ALJ found that Newell had not engaged in substantial gainful activity from his alleged onset date of January 1, 2003 through the date last insured of March 31, 2004. (R. 15.) He concluded at step two that Newell had the severe impairments of "status post motorcycle accident" and "an affective disorder (depression)." (*Id.*) In doing so, the ALJ did not apply the "special technique" for evaluating the severity of mental disorders set forth in 20 CFR § 404.1520a. *See Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008) (stating that the special technique is used at steps two and three of the five-step evaluation). However, the ALJ used it at step three to find that Newell suffered from moderate restrictions in his activities of daily living, had mild restrictions in his social functioning and concentration, but had not experienced any episodes of decompensation.[5] (R. 15-16.) As a result, the ALJ found that Newell did not meet or medically equal Listing 12.04 (affective disorders). (R. 15.) In addition, the ALJ determined that Newell's "status post motorcycle accident" did not meet or equal a Listing, though he omitted any reference to a specific listed category. (*Id.*)

---

[5] These four broad functional areas are part of the Paragraph B criteria for assessing the severity of a mental impairment under the special technique. *See* 20 CFR § 404.1520a(c)(3); 20 CFR Pt. 404, Subpt. P, App. 1 § 12.00C. A claimant can also meet Listing 12.04 if he satisfies the Paragraph C criteria. Here, the ALJ found that these criteria were not met because Newell was able to engage in activities of daily living such as shopping, running errands, and keeping medical appointments. (R. 16.)

Before moving to step four, the ALJ found that Newell had the residual functional capacity ("RFC") through his date last insured to perform work at the medium exertional level, though several non-exertional restrictions were also found.  (R. 17-19.)  These include a "moderate inability to remember, understand, carry out detailed instruction [sic] and dealing with complex work situations."  (R. 17.)  The ALJ concluded that Newell's testimony concerning the intensity, persistence, and limiting effects of his claimed impairments were not entirely credible.  (*Id.*)  Based on these findings, the ALJ determined at step four that Newell could not perform his past relevant work.  (R. 19.)  After considering testimony from the VE, the ALJ moved to step five to find that there was a significant number of jobs in the national economy during Newell's claimed period of disability that he could have performed.  (R. 20.)  As such, the ALJ concluded that Newell was not disabled.  (R. 21.)

Newell now argues that the ALJ's decision is erroneous because (1) the ALJ failed to properly assess his credibility and (2) failed to account for all of his exertional and nonexertional limitations in determining his RFC.

**C.    The ALJ Failed To Build An Accurate And Logical Bridge From the Evidence To His Conclusion That Claimant Was Not Entirely Credible.**

Newell first argues that the ALJ erroneously engaged in "nit-picking at evidence" and that his decision "doesn't lead to common sense."  (Pl.'s Mot. at 10.)  In support, Newell relies on *Shramek v. Apfel*, 226 F.3d 809 (7th Cir. 2000).  In *Shramek*, the Seventh Circuit found that an ALJ failed to build a logical bridge between the record and the credibility assessment when he failed to adequately state how the evidence undermined the claimant's testimony.  *Shramek*, 226 F.3d at 811-13.  Although Newell

15

uses different terms to articulate his concerns, we construe his reliance on *Shramek* to allege that ALJ Anglada also failed to logically connect the record to his credibility analysis.

An ALJ is always required to "build a logical bridge between the evidence and his conclusion" that a claimant's testimony is not credible. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). A court is obligated to review the ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft*, 539 F.3d at 678. The ALJ should consider the entire case record and give specific reasons for the weight given to an individual's statements. SSR 96-7p; *see also Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (stating that an ALJ must "articulate specific reasons for discounting a claimant's testimony as being less than credible"). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 CFR § 404.1529(c)(3); SSR 96-7p. A reviewing court must be mindful that reversal on this ground is appropriate only if the credibility determination is so lacking in explanation or support that it is "patently wrong." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

As an initial matter, it is not entirely clear that Newell's credibility argument encompasses the ALJ's findings concerning depression. Assuming for the sake of argument that it does, however, we find no error in the ALJ's decision on this issue. The ALJ discussed the medical evidence related to Newell's depression at considerable

length, including several of the factors required under SSR 96-7p for assessing a claimant's credibility. In particular, he noted Newell's treatment record with Dr. Cherian in careful detail, and he gave at least some attention to the medications that were prescribed to help Newell cope with depression, anxiety, and insomnia. The notes of Newell's treating psychiatrist show that claimant continued to suffer from some symptoms of depression throughout his relatively brief treatment history, but his condition improved on medication to the point that Newell was "calmer" and "less irritable" by his last visit. (R. 204.) Dr. Cherian assessed his depression at that point as having improved to a level of four or five out of ten with "pretty good" energy, "brighter" affect, and an increased ability to concentrate. (*Id.*)

Newell presents no clear argument on why the ALJ's discussion of Dr. Cherian's records is incorrect. Instead, he points to treatment documents from the VA hospital that reflect counseling and medication Newell received in 2006 and 2007, over two years after his date last insured of March 31, 2004. The treatment a claimant receives after his date last insured can be relevant to assessing his condition during the disability period. *See Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period."). The ALJ did not consider these records as part of his credibility assessment. According to Newell, the VA records are important because they "verif[y] that his military career is valid." (Pl.'s Mot. at 11.)

The relevant issue is not the nature of Newell's military service, but whether the VA records provide evidence that the ALJ's credibility determination concerning claimant's depression is incorrect. Newell fails to show why that is the case under these

facts.  Newell suggests that the ALJ overlooked that he quit his job at Caterpillar due to the severity of his PTSD symptoms.  (Pl.'s Mot. at 11-12.)  At the hearing, however, Newell only stated that he took early retirement because his job was stressful, and he could qualify for an enhanced pension by leaving when he did.  (R. 33, 58.)  Dr. Sharma's VA treatment notes indicate that by April 20, 2007, Newell's PTSD and depression were at a level of four out of ten, and that his feelings of hopelessness and helplessness had disappeared.  (R. 234.)  Newell denied having flashbacks to his experiences in Vietnam, and his activity and energy levels had improved.  (*Id.*)  These treatment notes are not so different from Dr. Cherian's two years earlier that they suggest the ALJ would have assessed Newell's credibility differently if he had considered them in his decision.  Thus, even if the ALJ should have discussed claimant's VA records, his failure to do so is merely harmless error that does not require remand.  *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (finding that the harmless error rule applies to social security cases).

The ALJ's credibility discussion regarding Newell's depression was not exhaustive on all fronts; he could, for example, have considered Newell's medication history with greater care.  We also recognize that Newell was not free from all symptoms of depression as of his date last insured, and he remained on medication for anxiety at the time of the hearing.  But these facts alone do not show that Newell's credibility on his depression was greater than what the ALJ assessed it to be, or that the ALJ erred in not considering the VA records as part of his credibility determination.  Accordingly, we cannot find that the credibility analysis is so lacking, or fails to account

for the record to such an extent, that it is "patently wrong" on the depression issue.

*Elder*, 529 F.3d at 413-14.

The ALJ's discussion of Newell's credibility concerning his physical condition rests on a less secure foundation. The Commissioner contends that the ALJ properly assessed this issue because the ALJ relied on the opinions of the state agency physicians to reach his credibility decision. Specifically, the Commissioner claims that ALJ Anglada considered Dr. Bilinsky's April 8, 2008 opinion concerning Newell's right leg contusion, and Dr. Vincent's July 3, 2008 report affirming that earlier assessment.[6] (R. 548, 551.) Reports by state agency physicians concerning the existence and severity of a claimant's impairments must be considered by the ALJ. 20 CFR § 404.1527(f); SSR 96-7p. Contrary to the Commissioner's claim, the ALJ did not do so in this case. ALJ Anglada only cited Dr. Bilinsky and Dr. Vincent to support his RFC finding. He did not rely on their reports to assess Newell's credibility. (R. 19.) As a result, the Commissioner cannot invoke the state agency physicians' reports at this point to justify the ALJ's credibility decision. *See Arnett v. Astrue*, — F.3d —, 2012 WL 1071707, at *6 (7th Cir. April 2, 2012) ("[T]he agency's attorneys . . . may not attempt to support the decision with evidence the agency apparently did not consider."); *Baker ex rel. Baker v. Barnhart*, 410 F. Supp. 2d 757, 766 (E.D. Wis. 2005) (stating that "neither the Commissioner nor the court may supply reasons for the ALJ" after the fact).

Even if these reports could be considered, moreover, they rebut rather than

---

[6] Although not directly relevant to this point, the Commissioner also contends that the ALJ's findings concerning Newell's depression are supported by Dr. Fyans' March 30, 2008 PRT. As above, the ALJ only considered Dr. Fyans' report on the RFC issue, not on credibility.

support the Commissioner's position. The Commissioner claims that substantial evidence supports the ALJ's credibility decision because the state agency physicians found that Newell did not have a medically determinable impairment. (Def.'s Mot. at 6-7.) To the contrary, these physicians only determined that Newell's complaints were not severe, not that he did not have a medical impairment at all. Dr. Bilinsky clearly assumed that a medical impairment existed when she marked a box on the agency report stating that claimant's "impairment or combination of impairments is considered to be non-severe." (R. 546.) In addition, the Commissioner overlooks that the ALJ implicitly *rejected* these assessments by finding at step two of his decision that Newell's leg injury was, in fact, a severe impairment. (R. 15.) The reports of the state agency physicians cannot be construed as supporting the ALJ's credibility finding when the ALJ disagreed with their assessments that Newell's leg injury was not severe.

The Commissioner is on somewhat stronger ground by arguing that Dr. Comfort's treatment records support the ALJ's credibility assessment. The medical record is a factor to be considered in determining a claimant's credibility. 20 CFR § 404.1529(c)(2); SSR 96-7p. Here, the ALJ correctly noted that Dr. Comfort found that Newell's leg wounds had largely healed by September 11, 2003, and that his range of motion was almost fully restored. (R. 18.) Dr. Comfort also noted "no limitation" in Newell's leg movement, though he stated that claimant continued to walk with pain. (R. 321.) This is evidence that Newell's condition had improved by the time he was released from treatment by Dr. Comfort.

That said, we disagree with the Commissioner that the ALJ adequately explained

his reasons for relying on Dr. Comfort's notes. The ALJ prefaced his discussion of these records by claiming that "the description of the symptoms and limitations which the claimant has provided throughout the record has generally been inconsistent and unpersuasive." (R. 18.) The problem with this reasoning is that the ALJ failed to identify any specific inconsistency or discrepancy between Newell's testimony and Dr. Comfort's notes. Newell did not claim at the hearing that his contusions never healed, that he did not feel better by the end of his treatment, or that he could not walk at all. He only stated that walking was painful and fatiguing for him. Neither the ALJ nor the Commissioner has cited any treatment note that contradicts this testimony.

The ALJ's belief that Newell's testimony contradicted Dr. Comfort's notes was based, in part, on a finding that the doctor determined that Newell could walk "without significant difficulty." (R. 18.) However, Dr. Comfort did not make such a finding as of the last treatment note of September 11, 2003. The treating physician, for example, never assessed claimant's ability to walk for a period of time, and he did not comment on Newell's level of fatigue. He noted instead that Newell walked with pain, even though his range of motion had returned to normal. (R. 321.) If the ALJ believed that Dr. Comfort's notes meant that Newell had a greater ability to walk than he claimed, and that he was not unduly fatigued by doing so, the ALJ was obligated to explain his reasons for finding that Dr. Comfort's notes contradicted Newell's allegations on these points.

The ALJ also overlooked important testimony that Newell gave at the hearing. Newell stated that he began walking with a cane after his accident with Dr. Comfort's

approval.  (R. 37, 66.)  The Commissioner argues that the ALJ's central task at the credibility stage was to determine if Newell was believable in stating that he could only walk with the aid of such a cane.  (Def.'s Mot. at 5.)   We agree that the ALJ was required to consider this issue as part of the credibility assessment, especially as claimant himself clearly believed the cane was important to his claim.  *See* SSR 96-7p (stating that an ALJ should consider "any measures other than treatment the individual uses or has used to relieve pain or other symptoms").

Rather than doing so, the ALJ took no notice of this issue and made no credibility finding concerning it.  This omission is especially troubling because the ALJ found at step three of his analysis that Newell suffered from moderate difficulties in his daily activities.  (R. 16.)  This conclusion was made in the context of the "special technique" for measuring the severity of a mental impairment, but the ALJ did not limit his discussion to the psychological factors involved in such an assessment.[7]  He also cited Newell's testimony that he had to use a grocery cart as a walker when he shopped for food.  (*Id.*)  This was a physical, not a psychological, limitation to Newell's activities that resulted from the pain and fatigue he allegedly experienced from walking.  (R. 51.)  The ALJ clearly credited Newell's statement that he needed such support to complete his shopping tasks.  (R. 16.)  Having done so, however, the ALJ was obligated to explain why Newell's need for a grocery cart/walker did not also mean that he needed a cane to

---

[7] The special technique involves assessing the functional categories described under Listing 12.00C. 20 CFR § 404.1520a(c)(3).  Listing 12.00C requires the ALJ to consider the "independence, appropriateness, effectiveness, and sustainability" of a claimant's daily activities.  This involves attention to the claimant's need for supervision, the consistency of his acts, and the presence of "interruptions or distractions."  20 CFR Pt. 404, Subpt. P, App. at § 12.00C.1

walk, as he alleged.  Without such an explanation, the ALJ failed to draw a logical

bridge between his step three finding and his reliance on his belief that Newell could

"walk without significant difficulty."  (R. 18.)

Social Security Ruling 96-7p also obligates an ALJ to consider the "type, dosage,

effectiveness, and side effects of any medication the individual takes or has taken to

alleviate pain" as part of the credibility assessment.  SSR 96-7p.  ALJ Anglada found

Newell's statements to be less than fully credible, in part, on the unusual basis that he

was "not prescribed [pain] medications stronger than Vicodin."  (R. 18.)  It is well

established that a claimant's exclusive use of non-prescription pain medication can cast

doubt on allegations of serious pain.  *See*, *e.g.*, *Donahue v. Barnhart*, 279 F.3d 441,

444 (7th Cir. 2002) (stating that evidence a claimant "relied for pain control on over-the-

counter analgesics" supported a conclusion that pain is not disabling).  But here, the

ALJ extended this principle to include prescription medication that he did not believe

was sufficiently powerful.  Without further explanation, however, it is not clear why

Newell's use of Vicodin is a basis for discounting his statements concerning pain.

Newell did not claim that his pain was so severe that it prevented him from walking at

all, at least after the first month following the accident.  He only testified that pain

restricted his functioning.

The ALJ further relied on the fact that Newell did not follow up with the

orthopedist Dr. Comfort referred him to on August 5, 2003.  (R. 320.)  A claimant's

failure to comply with a prescribed treatment can support an adverse credibility finding.

*Craft*, 539 F.3d at 679.  Social Security Ruling 96-7p makes clear, however, that "the

adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide . . . ."  SSR 96-7p.  *See also Ellis v. Barnhart*, 384 F. Supp. 2d 1195, 1203 (N.D. Ill. 2005) ("[T]he ALJ could rely on [claimant's] non-compliance as long as he had first considered [claimant's] explanations for her non-compliance.").  The ALJ in this case did not ask Newell why he failed to follow up on Dr. Comfort's referral, or what symptoms led Newell to ask to see an orthopedist.  Without doing so, the ALJ was not entitled to infer that his failure to follow through with the referral shows that Newell's pain was less serious than he described.

The objective medical record, of course, is only one of several sources of evidence that an ALJ is required to consider in assessing credibility.  *See* SSR 96-7p ("However, allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence.") (emphasis omitted).  The ALJ followed this guideline by considering a number of Newell's activities of daily living, including the fact that he takes his wife to the doctor, washes dishes, goes grocery shopping, drives a car, and plays the banjo in front of an audience.  (R. 18.)  The Commissioner claims without further explanation that these facts support the ALJ's finding.  For his part, Newell argues that the ALJ relied on "inconsequential activities" that do not show how he can perform work on a sustained basis.

We agree that the ALJ failed to explain why Newell's daily activities make his

statements concerning pain and fatigue less than credible.  It is entirely unclear how claimant's allegations concerning his ability to walk are affected by the fact that he played the banjo in front of his friends on a fishing trip.  (R. 51-52.)  Newell never testified that he suffered an injury to his hands or fingers as part of his motorcycle accident.  The ability to play a musical instrument in public might be relevant to Newell's social functioning, but the ALJ relied on it at the credibility stage to address claimant's physical capacity to carry out physical tasks on a daily basis.

Moreover, the other daily activities cited by the ALJ – shopping, cooking, and driving – are the kind of duties that do not automatically give rise to an inference that a claimant's statements concerning pain are non-credible, at least in the absence of more explanation than was provided here.  *See Zurawski*, 245 F.3d at 887 (noting that washing dishes, cooking, and doing laundry are relatively minimal tasks that are "not of a sort that necessarily undermines or contradicts a claim of disabling pain"); *Clifford*, 227 F.3d at 872 (holding that minimal daily activities do not demonstrate that a claimant is capable of performing substantial physical activity).  We are especially troubled by the ALJ's reliance on the fact that Newell shops for groceries.  As discussed earlier, he stated that he did so only by holding onto his grocery cart as a walker to support himself as he walked through the store.  (R. 51.)  Since the ALJ relied on this statement at step three to find moderate difficulties in daily activities, he was clearly obligated to explain why the same fact could be cited at the credibility stage to discount the reliability of claimant's statements concerning his walking, pain, and fatigue.

More fundamentally, the ALJ provided no explanation of why Newell's daily

activities support a conclusion that he was not credible in claiming that he was unable to work on a continuing basis. The Seventh Circuit has repeatedly advised ALJs that they must account for the important differences that exist between the flexibility and family support involved in performing daily activities and the more onerous, and potentially less flexible, duties involved in a work environment. *See*, *e.g.*, *Bjornson v. Astrue*, 672 F.3d 640, 647 (7th Cir. 2012) ("The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.")

That is the case here because the fact that his wife is herself disabled presumably gives Newell little choice but to carry out many necessary duties. When a claimant bears some special responsibility for performing such activities, an ALJ cannot automatically equate the fact that he does so with the claimant's ability to carry out full time work. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("[Plaintiff] *must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts. A person can be totally disabled for purposes of entitlement to social security benefits even if, because of . . . circumstances of desperation, he is in fact working."). ALJ Anglada gave no consideration to this issue and provided no explanation of why the moderate restrictions in daily activities that were found to exist at step three are consistent with a finding that Newell's testimony concerning his ability to walk was not credible.

For all of these reasons, the ALJ failed to build a logical bridge from the evidence to his credibility assessment concerning Newell's physical condition. On remand, the

ALJ shall explain how the record, daily activities, and other factors provided for in SSR 96-7p support the credibility finding.  The ALJ shall also clarify what specific portion of Newell's statements, if any, are found to be non-credible.

### D.     Substantial Evidence Does Not Support The RFC Finding.

Newell also argues that the ALJ's RFC finding that he can perform medium work is erroneous, and that substantial evidence does not support the nonexertional mental limitations found by the ALJ.  The Commissioner has not responded to this argument, claiming instead that Newell only seeks remand based on the ALJ's credibility assessment.  (Def.'s Mot. at 8.)  It is true that the RFC and credibility issues are not always clearly separated in Newell's motion.  Nevertheless, he cites the requirements for medium work at length, objects to the ALJ's findings concerning exertional and nonexertional limitations, and claims that it "was a significant and material error not to find any exertional limitation in his ability to work at a medium level."  (Pl.'s Mot. at 10.)  These allegations are sufficient to state a claim concerning the ALJ's RFC determination.

The RFC measures what work-related activities a claimant can perform despite his limitations.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); SSR 96-8p.  An ALJ must consider all the evidence in the record including the claimant's medical history, daily activities, medical source statements, and lay reports.  SSR 96-8p.  Both medical and non-medical evidence are important in determining RFC because, although the RFC is a legal decision for the ALJ to make, he may not do so without an adequate evidentiary basis.  *See Diaz*, 55 F.3d at 306 n.2.  In addition, SSR 96-8p requires an

27

ALJ to provide a narrative discussion on how the evidence supports each of the RFC conclusions and how the claimant is able to sustain "work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent schedule)."  SSR 96-8p.

Unfortunately, ALJ Anglada did not comply with these requirements in determining Newell's physical or mental RFC.  The medical bases the ALJ relied on are of particular concern in this case.  The ALJ claimed that the record contains RFC assessments by the state agency physicians that support his findings.  (R. 19.)  This is clearly incorrect.  Dr. Fyans' PRT made no findings concerning Newell's mental impairment or the restrictions it imposed on his ability to work (R. 529-41), and Dr. Vincent also failed to assess Newell's mental or physical RFC.  (R. 551.)  Dr. Bilinsky did not make a RFC determination related to the two severe impairments found at step two, depression and a leg injury, though she did find that Newell was restricted to light work because of his ileal conduit.[8]  (R. 544.)  Moreover, the ALJ severely limited his reliance on these reports by stating that, although they allegedly supported his conclusions, he did *not* rely on them to determine Newell's RFC.  He wrote: "[A]lthough I reached a similar assessment, this was done based on an independent consideration of the evidence uninfluenced by what was decided by the DDS [state disability

---

[8]  Social Security Ruling 96-8p states that the RFC "must be based solely on the individual impairment(s)" present in a case.  SSR 96-8p.  The only impairments at issue here are the two stated in the ALJ's decision, not the bladder cancer that gave rise to the need for an ileal conduit.  As a result, we do not address the discrepancy between Dr. Bilinsky's assessment of light work and the ALJ's finding of medium work.  Newell does not claim that the ALJ erred on this basis.

determination] . . . ."[9]  (R. 19.)  The only other physicians cited in the ALJ's decision are Dr. Cherian and Dr. Comfort, neither of whom provided a mental or physical RFC for Newell.

It is clear that instead of citing medical evidence, the ALJ fashioned his own RFC and justified it by claiming that the assessment "is supported by the clinical and objective medical evidence of record."  (R. 19.)  What that evidence is, or how it supports Newell's RFC, remains unexplained in the ALJ's decision.  This is erroneous because an ALJ is always obligated to clarify "how the evidence supports each [RFC] conclusion, citing specific medical facts."  SSR 96-8p.  The failure to do so is in itself a ground for remand.  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  Even when the record contains medical evidence concerning a claimant's ability to work, "[t]he ALJs are not permitted to construct a 'middle ground' RFC without a proper medical basis."  *Norris v. Astrue*, 776 F. Supp. 2d 616, 637 (N.D. Ill. 2011) (*citing Bailey v. Barnhart*, 473 F. Supp. 2d 822, 838-39 (N.D. Ill. 2006)).  As ALJ Anglada cited no medical evidence concerning Newell's capacity to walk, sit, stand, push, or pull, his decision is not even a "middle ground" between competing medical assessments of Newell's ability to work.

The ALJ also omitted any non-medical evidence to support his finding that Newell is capable of carrying out work at the medium exertional level.  Such work

---

[9]  Contrary to ALJ Anglada's apparent assumption, an ALJ is entitled to rely on the opinion of a state agency physician in assessing the limitations imposed by a claimant's impairments. *See Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447-48 (7th Cir. 2004); *see also* 20 CFR § 404.1527(f)(2)(i) (stating that state agency medical consultants are "highly qualified physicians . . . who are also experts in Social Security disability evaluation").

requires a person to walk for up to six hours a day, to carry up to twenty-five pounds frequently, and to lift fifty pounds at a time. SSR 83-10. The ALJ did not inquire at the hearing about Newell's capacity to walk, lift, or carry. His decision cites no other part of the record that relates to these issues. As before, Newell's ability to walk is of particular concern in light of the step three restrictions in daily activities. If Newell must use a grocery cart as a walker, the ALJ was, at a minimum, required to explain how he could walk six hours a day and carry out medium work "on a regular and continuing basis." SSR 96-8p.

This oversight is compounded by the ALJ's failure to consider the fact that Newell at least claimed that he had been required to use a walking cane ever since his motorcycle accident. Even when a cane is not prescribed by a physician, an ALJ errs when he does not include its use in the RFC assessment *and* does not explain his reasons for not doing so.[10] *See Cruz v. Astrue*, 746 F. Supp. 2d 978, 989 (N.D. Ind. 2010). In *Cruz*, an ALJ's failure to discuss his reasoning was erroneous despite the fact that a state agency physician opined that the cane was not physically necessary for the claimant to walk. *Id.* Even that piece of medical evidence is missing here, and the ALJ overlooked the issue in its entirety. An ALJ must always "include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-

---

[10] Medical documentation of the need for a cane is required when the RFC involves less than a full range of sedentary work. *See* SSR 96-9p; *see also Staples v. Astrue*, 329 Fed.Appx. 189, 191-92 (10th Cir. 2009). This case, however, involves the more onerous burdens of medium work. Moreover, the fact the ALJ apparently gave credence to Newell's claim that he used the grocery cart as a walker should have alerted him to the need to address the cane issue in some manner.

8p.  By not doing so, ALJ Anglada again failed to "build an accurate and logical bridge

from the evidence to his conclusion."  *Young*, 362 F.3d at 1002 (*quoting Scott v.*

*Barnhart*, 297 F.3d 589, 595) (7th Cir. 2004)).

Turning to the mental restrictions in the ALJ's decision, Newell argues that the

ALJ failed to consider PTSD in assessing his RFC.  It is not clear whether the ALJ did so

or not.  Dr. Cherian diagnosed Newell as suffering from both depression and PTSD,

which are categorized as separate disorders under the Listings.[11]  (R. 210.)  ALJ

Anglada found at step two that Newell's depression constituted a severe impairment.  (R.

15.)  Presumably, the ALJ implicitly found that his PTSD was a non-severe condition.  If

that is the case, the ALJ was obligated to consider both depression and PTSD as part of

the RFC because he was required to assess the combined effect of all the impairments

Newell has, "even those that would not be considered severe in isolation."[12]  *Terry v.*

*Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

Notwithstanding, we find that any oversight by the ALJ in discussing Newell's

PTSD is harmless error.  The ALJ noted Dr. Cherian's PTSD diagnoses and considered

the symptoms of both depression and PTSD in some detail.  Dr. Cherian's notes do not

suggest that PTSD imposed additional problems or restrictions that the ALJ did not

---

[11] Listing 12.00D.11 describes PTSD as an anxiety disorder. Listing 12.04 characterizes depression as an affective disorder.  20 CFR Pt. 404, Subpt. P, App.1 §§ 12.00D.11 and 12.04.  Affective disorders (Listing 12.04) are distinguishable from anxiety disorders (Listing 12.06) under the Listings.

[12] Newell also claims that the ALJ failed to consider his headaches as part of the RFC.  As with PTSD, the ALJ appears to have concluded that claimant's headaches were a non-severe impairment at step two.  If so, he was also required to consider the combined impact of the headaches with Newell's other severe and non-severe impairments in assessing RFC.  The failure to consider the full impact of a claimant's severe and non-severe impairments requires reversal. *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010).  The ALJ shall clarify the basis of his reasoning on this issue on remand.

consider, and it is unclear why the ALJ would reach a different decision on remand on the narrow basis Newell proposes.  In any event, as this case requires remand on other grounds, the ALJ will have an opportunity to consider any additional PTSD symptoms that he did not take account of in the mental RFC.

## III.    CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment is granted.  The Commissioner's cross-motion for summary judgment is denied.  This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.  It is so ordered.


                                        ENTERED:


                                        _____
                                        **MICHAEL T. MASON**
                                        **United States Magistrate Judge**

**Dated: April 23, 2012**